UNITED STATES of America, Appellee,

v.

D.K. JOHNSON, Defendant–Appellant.

No. 948, Docket 92–1494.

United States Court of Appeals,
Second Circuit.

Argued Feb. 18, 1993.

Decided May 26, 1993.

Jeremy Gutman, New York City, for defendant-appellant.

Peter A. Norling, Leslie R. Caldwell, Asst. U.S. Attys., Eastern District of New York (Mary Jo White, U.S. Atty., E.D. of N.Y., of counsel), for appellee.

Before: OAKES, ALTIMARI, and MAHONEY, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant D.K. Johnson appeals from a judgment entered on August 7, 1992 after a jury trial in the United States District Court for the Eastern District of New York (Raggi, J.), convicting him of attempted murder, assault with intent to commit murder, and assault causing serious bodily injury. All of these acts occurred within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. §§ 1113, 113(a), 113(f) (1988). Johnson was also convicted of using and carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c) (1988). Johnson was sentenced principally to concurrent terms of five years' imprisonment on the attempted murder and assault counts, to be followed by a consecutive term of five years' imprisonment on the weapons conviction.

Johnson appeals on four grounds. First, he argues that the district court lacked subject matter jurisdiction over his case, since the Brooklyn Navy Yard, where Johnson's offense took place, was not within the jurisdiction of the United States. Second, Johnson contends that the district court erred in admitting audio tapes under the independent source exception. Third, he asserts that the district court failed to instruct the jury properly on his theory of defense that he was in a dissociative state when he committed his offenses. Lastly, he challenges a two-level enhancement of his sentence by the district

court based on the court's finding that he had perjured himself during trial.

For the following reasons, we affirm the judgment of the district court.

## BACKGROUND

D.K. Johnson was a civilian employee of the United States Navy from 1982 to November 1989. He had previously been a lieutenant in the Army, and had served two tours of duty in Vietnam. Johnson worked as a manager of an officers' club and fast food service at the Brooklyn Navy Yard ("the Navy Yard"), under the supervision of Floyd Dennis Roberts.

Roberts and Johnson had a history of personal and professional conflicts, problems which led Johnson to file numerous complaints against Roberts. To obtain evidence to support his grievances against Roberts, Johnson began wearing a miniature tape recorder under his shirt. Using this recorder, Johnson taped many conversations between himself and others, as well as statements made by him alone.

As the problems with Roberts continued to grow, and the resultant pressures at work began to escalate, Johnson became increasingly distressed. On November 2, 1989, Johnson accosted Roberts in Roberts's office while wielding a sawed-off shotgun. There was a scuffle and a chase, resulting in Johnson shooting and severely wounding Roberts. Johnson also shot Naval officer Carl Peach, who tried to intervene on Roberts's behalf. The entire episode took place inside a building at the Brooklyn Navy Yard, which at the time housed the command and other offices of the Navy's New York area operations.

Following the shooting, federal officers arrested Johnson, seized his shotgun, and searched his pockets. In his pockets were the tape recorder, a microphone, and several of Johnson's audio cassette tapes. Agents for the Naval Investigative Service ("NIS") then obtained search warrants for Johnson's quarters and van signed by a Navy captain. After executing the warrants, the agents seized more audio tapes made by Johnson.

Prior to trial, Johnson moved to suppress the evidence taken from his quarters and van pursuant to the command-issued search warrants. The United States District Court for the Eastern District of New York (Raggi, J.) granted the motion, finding that the search warrants were unsupported by probable cause and were unduly broad. Johnson also moved to suppress the tapes seized from his pockets incident to arrest. Those tapes had remained unplayed for almost six months, when federal agents listened to them without obtaining a warrant authorizing their review. On the tapes, Johnson could be heard making various comments about his co-workers and about himself that reflected his state of mind prior to the shooting. In his suppression motion, Johnson argued that, although the initial seizure of the tapes was lawful, NIS agents had unlawfully "searched" the tapes by listening to them six months later without a warrant. The district court expressed concern that the review of the tapes might not be allowed as incident to arrest, prompting the government to apply for a warrant to review the tapes.

The government introduced an affidavit of the supervising NIS agent, Kenneth P. Rodgers, who stated that there was independent probable cause for searching the tapes apart from the fact that the agents had already listened to them and knew what they contained: namely, that two of the tapes were labelled with the names of people to whom Johnson had complained about Roberts, and witnesses had heard Johnson talk about taping conversations due to his problems with Roberts. Upon reviewing the affidavit and accompanying documents, the district court denied Johnson's suppression motion and issued the search warrant under the "independent source" exception to the Fourth Amendment. The court ruled that the affidavit established probable cause independent of what had been gleaned from the prior listening to the tapes, and that the prior review had not been the basis for the warrant application.

At trial, Johnson's defense was based on the theory that at the time of the attack he was in a "dissociative state" that led him to believe that he was in a Vietnam firefight. Johnson's counsel argued that this dissociative state vitiated the *mens rea* requirement

of intent for the offenses with which Johnson was charged. To support the argument, Johnson testified about his Vietnam experience at length. Specifically, he recounted an episode involving a murdered soldier who had died in his presence. He then told about how his problems with Roberts had caused him to lose sleep and become distraught. He testified that when he approached Roberts, things "went hazy" and he saw "a scene in Vietnam" involving a battle.

Johnson's testimony was supported by the testimony of a psychiatrist, who attested that Johnson had been suffering a dissociative disorder when he attacked Roberts. The psychiatrist analogized the disorder to sleepwalking, and stated that Johnson could not have been responsible for his actions.

The government countered Johnson's case with testimony from a Vietnam veteran who disputed Johnson's recollections about the injured soldier, stating that Johnson had never been in the dying man's presence. Furthermore, evidence indicated that Johnson's only involvement with the soldier was transporting evidence of the soldier's murder to a lab. The government also introduced expert testimony from a psychiatrist who opined that Johnson was malingering and not suffering from a dissociative state the day of the attack.

The jury found Johnson guilty of attempted murder, assault with intent to commit murder, and assault causing serious bodily injury, all within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. §§ 1113, 113(a), 113(f) (1988). Johnson was also convicted of using and carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c) (1988). The district court sentenced Johnson to concurrent terms of five years' imprisonment on the attempted murder and assault counts, to be followed by a consecutive term of five years' imprisonment on the weapons count. The sentence was enhanced by two levels pursuant to U.S.S.G. § 3C1.1 for what the district court found was Johnson's perjurious testimony regarding his Vietnam experience with the murdered soldier.

Following trial, the government received additional information regarding the jurisdictional status of the Brooklyn Naval Yard. This information was disclosed to the court and to Johnson, who subsequently moved to dismiss the indictment for lack of subject matter jurisdiction. Johnson asserted that the federal government had never obtained jurisdiction over the relevant part of the Navy Yard because it had failed to file a formal notice of its acceptance of legislative authority in accordance with 40 U.S.C. § 255 (1988). Moreover, Johnson claimed that any jurisdiction obtained reverted to the state by operation of law in 1966, when the Navy ceased traditional ship-building and repair work at the yard. Johnson argued that the termination of traditional navy yard functions had violated conditions placed on the cession by the state.

The district court held a post-trial hearing on the issue and elicited the following relevant facts. In 1941, the United States acquired title to parcel "M–494," the parcel of land on which Johnson's attack on Roberts took place, for the purpose of expanding the Navy Yard. At the time M–494 was acquired, New York State had already transferred exclusive jurisdiction over all other areas of the then-existing Navy Yard to the federal government.

On February 16, 1944, the Acting Secretary of the Navy formally requested cession of exclusive jurisdiction over M–494. The application was made pursuant to New York State law, and included documents required by state law for cession of exclusive jurisdiction. See N.Y. State Law § 52 (McKinney 1984). On May 10, 1944, the governor of New York executed a deed ceding exclusive jurisdiction to the federal government for M–494. This was also accomplished pursuant to state law. Id. In that deed, which related specifically to M–494, the governor stated that the United States had expressly requested New York's cession of exclusive jurisdiction and had filed all documents required by state law. The deed also provided that the cession was intended "for use in connection with the expansion of the Brooklyn Navy Yard." A copy of the signed deed was delivered to the federal government, and a copy was also forwarded to the Department of Justice for filing.

The Navy stopped traditional "navy yard" work in the dock and drydock areas of the Navy Yard in 1966. However, naval operations continued on other parts of the Navy Yard, including M–494, until late 1991, when all area naval facilities were transferred to Staten Island. From 1941 through 1991, the United States exercised exclusive jurisdiction in all cases involving the Navy Yard.

The district court denied Johnson's motion to dismiss his indictment and overturn his conviction, finding that there was subject matter jurisdiction over the case. Specifically, the court held that the United States had successfully complied with 40 U.S.C. § 255 by following New York procedures for ceding jurisdiction.

Johnson now appeals.

## DISCUSSION

### I. Subject Matter Jurisdiction

Johnson first argues that the district court did not have subject matter jurisdiction over his case. Specifically, Johnson maintains that the United States did not have jurisdiction over the Navy Yard, because the federal government never formally accepted jurisdiction over M–494 from the state. Moreover, he argues that any jurisdiction accepted reverted to the state in 1966, when the Navy terminated shipbuilding at the Navy Yard. We disagree.

### A. Whether There Was Acceptance

■ The federal government may acquire property within a state. U.S. Const. art. I, § 8, cl. 17; Kohl v. United States, 91 U.S. 367, 371, 23 L.Ed. 449 (1875). The federal government can only acquire jurisdiction over that property, however, if both state and federal governments agree to the transfer. See, e.g., Paul v. United States, 371 U.S. 245, 264, 83 S.Ct. 426, 437, 9 L.Ed.2d 292 (1963). Otherwise, the United States does not take jurisdiction over the property, and can only be a proprietor of the property. Id.

During the 1930's, the Supreme Court decided a series of cases involving whether general state cessions of jurisdiction were valid without federal government acceptance of that jurisdiction. See Collins v. Yosemite Park & Curry Co., 304 U.S. 518, 522–24, 58 S.Ct. 1009, 1010–12, 82 L.Ed. 1502 (1938); James v. Dravo Contracting Co., 302 U.S. 134, 141–42, 146–49, 58 S.Ct. 208, 212–13, 214–16, 82 L.Ed. 155 (1937); Silas Mason Co. v. Tax Commission of Washington, 302 U.S. 186, 197–99, 58 S.Ct. 233, 238–40, 82 L.Ed. 187 (1937). Each case involved litigants seeking to avoid application of state law, arguing that general automatic state ceding statutes—which ceded jurisdiction upon the mere acquisition of property by the federal government—precluded enforcement of state laws. In all three cases, the Supreme Court noted that the United States could not be forced to accept unwanted legislative jurisdiction, and held that the general ceding statutes were insufficient in themselves to transfer legislative authority. See Collins, 304 U.S. at 527–28, 58 S.Ct. at 1013–14; Silas Mason Co., 302 U.S. at 207, 58 S.Ct. at 243-44; James, 302 U.S. at 147–48, 58 S.Ct. at 215.

■ Congress responded to these decisions by enacting 40 U.S.C. § 255, which sets forth how the United States can obtain and accept grants of jurisdiction by the states. Section 255 states in relevant part:

Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are

situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted.

Section 255 thus requires a department or agency to follow a series of steps in order to acquire jurisdiction over a particular piece of state land: (1) the agency must acquire ownership of the parcel; (2) it must secure from the state consent to such jurisdiction; and (3) it must indicate acceptance by *either* (a) formal acceptance to the governor of the state or (b) by complying with the relevant state law requirements. *Id.*

There is no evidence nor any contention that the United States ever filed a formal notice of acceptance for M–494. Johnson argues that without such formal acceptance, exclusive federal jurisdiction never vested. *See, e.g., Adams v. United States*, 319 U.S. 312, 314, 63 S.Ct. 1122, 1123, 87 L.Ed. 1421 (1943); *DeKalb County, Georgia v. Henry C. Beck Co.*, 382 F.2d 992, 995 (5th Cir.1967).

█ Johnson, however, ignores that § 255 sets out *two* distinct ways for the federal government to accept jurisdiction. The first is by formal acceptance, which concededly is not present here. The second is by "such other manner as may be prescribed by the laws of the State where such lands are situated." 40 U.S.C. § 255. This authorizes the United States to accept jurisdiction by complying with state law requirements governing succession. The act of compliance with those requirements is tantamount to formal acceptance.

This second manner is the process by which the federal government accepted jurisdiction here. The federal government fully complied with the state statutes governing cession of jurisdiction to the federal government, which stated that:

Whenever the United States ... [files] in the office of the secretary of the state of New York, maps or plats and descriptions by metes and bounds of any tracks or parcels of land within [New York] ... which have been acquired by the United States for any of the purposes aforesaid, and a certificate of the attorney-general of the United States that the United States is

in possession of said lands and premises ..., the governor of this state is authorized, if he deems it proper, to execute ... a deed or release of the state ceding to the United States the jurisdiction of said tracts or parcels of land....

N.Y. State Law § 52 (McKinney 1984). In this case, the Acting Secretary of the Navy formally requested cession and enclosed the necessary documents required by the state, including the maps, plats, and descriptions of the metes and bounds of the property. The district court found, and we agree, that this action complied with relevant state law and therefore effectively satisfied the acceptance requirement of § 255.

As was discussed earlier, § 255 came as a response to Supreme Court decisions involving automatic cession statutes. The statute was designed to ensure that such automatic cession statutes did not saddle the United States with unwanted jurisdiction. *See Adams*, 319 U.S. at 314, 63 S.Ct. at 1123. In order to prevent those statutes from triggering automatic assumption of jurisdiction, § 255 requires the government to take some sort of affirmative action to demonstrate acceptance of the jurisdiction. This affirmative action can be manifested by: (1) a formal notice of acceptance to the state government, or (2) compliance with state laws indicating the federal government's intent to accept jurisdiction. The compliance vitiates the need for formal acceptance, since it is clear that the federal government is willing—and indeed eager—to assume jurisdiction.

The United States took affirmative action under § 52 by filing documents relevant to M–494, substantiating the district court's finding that it was willing to accept jurisdiction. This is especially true where the federal government exercised unchallenged exclusive jurisdiction over M–494 for almost 50 years. Obviously, New York, the United States, and all involved parties regarded the compliance by the federal government with New York law to be equivalent to formal notice of acceptance.

Because the federal government here clearly complied with New York state law, and took affirmative steps to obtain jurisdic-

tion, the 1944 cession by New York was valid. Therefore, the district court was correct to find that it had subject matter jurisdiction over Johnson's offense:

## B. *The Reversion to State Jurisdiction*

· Johnson also argues that any jurisdiction over M–494 reverted to the state when the Navy stopped using the Navy Yard for traditional navy yard work. The deed signed by the New York Governor in 1944 ceding M–494 provided that M–494 was ceded "for use in connection with the expansion of the Brooklyn Navy Yard." Moreover, in an 1853 transfer of authority over an early Navy Yard parcel, the deed stated that the parcel could be used as a "navy yard and naval hospital" for "so long only as the land shall be used for the purposes of the cession." Johnson argues that these conditions were broken when the Navy stopped using the Navy Yard for shipbuilding in 1966, even though the yard was used for other naval activities until 1991.

■ States may attach conditions to the cession of property, and federal jurisdiction can be exercised only for so long as those conditions are met. *See generally S.R.A. Inc. v. Minnesota,* 327 U.S. 558, 564, 66 S.Ct. 749, 753, 90 L.Ed. 851 (1945); *Fort Leavenworth R.R. Co. v. Lowe,* 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1885). Furthermore, under state law, jurisdiction ceded "shall continue in respect to said property so long as the same shall remain the property of the United States, and be used for the purposes aforesaid, and no longer." N.Y. State Law § 54.

■ Johnson argues that New . York placed a condition on the cession of jurisdiction for the Navy Yard—that the yard be used for shipbuilding. He maintains that federal jurisdiction reverted once the Navy violated that condition. Until 1991, however, the Navy was clearly using the Navy Yard, and parcel M–494, for naval purposes. Although shipbuilding was no longer taking place, there is nothing in the grants by New York to the United States to indicate that only shipbuilding was anticipated as a function for the yard.

■ Johnson's interpretation of the grant of jurisdiction is too strict, and does not allow for the evolution of the Navy's needs. The federal government must be given some leeway in making use of ceded property. It cannot be held to a rigid interpretation of antiquated deeds that failed fully to anticipate the complex development of naval operations. The Navy's needs change, and jurisdiction ceded to the United States should not revert to the state merely because the function of ceded property evolves over time. *Cf. Humble Pipe Line Co. v. Waggonner,* 376 U.S. 369, 372–73, 84 S.Ct. 857, 859–60, 11 L.Ed.2d 782 (1964) (cession of jurisdiction will not revert to the state merely because some parts of a parcel are no longer used in the manner the state intended). While it is conceivable that some evolution might exceed the conditions of a grant of land so severely as to terminate the cession and cause a reversion of jurisdiction, the "evolution" in this case does not meet that standard.· The Navy continued to use the Navy Yard at issue within the general terms of the grant.

We are persuaded that neither New York nor the United States intended that the cession could only be used for shipbuilding and not for other ancillary naval functions. For these reasons, jurisdiction did not revert to the state once the function of the Navy Yard had evolved beyond shipbuilding.

## II. *The Admission of Johnson's Tapes*

Johnson next argues that the district court erred in admitting his audio tapes under the "independent source" exception to the exclusionary rule. He notes that the government did not apply for a warrant to review the tapes until agents had already listened to them. Johnson maintains that the subsequent warrant application was grounded on the illegal search of the tapes by the agents. Therefore, he argues, the independent source exception does not apply, and the contents of the tapes should have been suppressed.

■ The Supreme Court in *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), established the contours of the independent source exception. In *Murray,* government agents obtained a

search warrant for a warehouse after they had already entered it and seen numerous burlap-wrapped bales they suspected contained marijuana. The Court held that the exception permits "second-look" warrants when the "later, lawful seizure is genuinely independent of the earlier, tainted one." *Id.* at 542, 108 S.Ct. at 2535. The two elements that must be satisfied to allow admission in such circumstances are: (1) the warrant must be supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct. *Id.*

Courts have applied the independent source exception in cases where the police stumble upon evidence while engaging in an unlawful search or entry, but where there was an independent basis apart from the illegal entry to allow a warrant to issue. *See, e.g., United States v. Herrold,* 962 F.2d 1131, 1139–40 (3d Cir.) (holding that independent source exception allowed admission of cocaine and drug paraphernalia where agents had entered defendant's trailer unlawfully, seen the inculpatory evidence in plain view, and immediately applied for a search warrant without seizing the evidence), *cert. denied,* —— U.S. ——, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992); *United States v. Mulder,* 889 F.2d 239, 241–42 (9th Cir.1989) (holding that independent source exception allowed admission of chemical tests conducted pursuant to a warrant after defendant's first conviction had been reversed because those same tests had been conducted without a warrant).

In this case, the first element of *Murray* is easily satisfied. The government demonstrated, as Agent Rodgers' affidavit made clear, that there was independent probable cause to listen to the tapes. This probable cause was based on statements by witnesses that Johnson had made the tapes to support his claims against Roberts. Also, some of the tapes bore the names of individuals with whom Johnson had discussed Roberts. The tapes were clearly relevant to the case, since there was good reason to believe that they would shed light on Johnson's state of mind leading up to the shooting.

The second element, while more complex, is also satisfied. The NIS agents did indeed listen to the tapes prior to applying for the warrant, and they knew when they applied for the warrant that the tapes contained material evidence. However, the relevant question is whether the warrant "would have been sought even if what actually happened had not occurred." *Murray,* 487 U.S. at 542 n. 3, 108 S.Ct. at 2536 n. 3. In other words, we must consider whether the agents would have applied for a warrant had they not listened to the tapes beforehand.

Clearly, the agents would have and could have applied for and been issued a warrant to listen to the tapes regardless of their prior review. As noted above, there was probable cause for the warrant to issue, and the agents had good reason to want to review the tapes. In fact, the only reason the agents failed to apply for a warrant prior to listening to the tapes was their mistaken belief that they were entitled to do so. Once the district court expressed reservations about the legality of the review of the tapes, the government realized that a warrant was necessary. Whether the agents made their mistake in good faith is not relevant to this inquiry. What is key is the fact that their error did not result in the government obtaining evidence it would not otherwise have obtained. The government would have acquired the evidence on the tapes without the agents' mistaken prior review of the tapes, since the warrant application was prompted not by the prior review but by the obvious relevance of the tapes and the district court's indication that a warrant was necessary.

When admitting evidence under the independent source exception, courts must be careful to ensure that the government does not gain an advantage from its initial violation. In this case, the government did not apply for the warrant based on its premature review of the tapes. Rather, the application was based on the clear materiality of the tapes and the impetus given by the district court's warning that a warrant might be necessary. The review of the tapes should not operate to suppress the tapes when the

review was not a factor in applying for or receiving the warrant.

## III.  *The Jury Charge*

Johnson contends that the district court failed to properly charge the jury on his dissociative disorder defense. Johnson proposed a charge which would have given the jury specific instructions that if it found that he "was in a dissociative state at the time of the incident, [it] must find him not guilty of the charges." The proposed charge was three paragraphs long, and explained the dissociative defense and its implications for the case in depth.

Instead of the proposed charge, the district court charged as follows:

Let me be certain that you understand the reason for this [expert psychiatric] testimony. As I have told you, the charges in this case require the government to prove not only that the defendant engaged in certain conduct, but that his conduct was knowing and willful. As to certain of the charges, the government must prove that the defendant operated with specific intent....

Only you, the jury, may determine whether a defendant did or did not have the mental state or condition required by law for the commission of a crime. The law does not permit testimony on these ultimate issues from psychiatrists or any other experts. Evidence from psychiatric experts about the operation of the human mind may or may not, however, help you, in resolving these issues of mental state or condition.

■ A criminal defendant is entitled to a jury charge that reflects any defense theory for which there is a foundation in the evidence. *See United States v. GAF Corp.*, 928 F.2d 1253, 1262 (2d Cir.1991). However, defendants "are not necessarily entitled to have the exact language of the charge they submitted to the district court read to the jury." *United States v. Durham*, 825 F.2d 716, 719 (2d Cir.1987). Rather, a charge is sufficient

if it adequately appraises the jury of the crime and the defense. *See id.; United States v. Diez*, 736 F.2d 840, 844 (2d Cir. 1984).

■ Although Johnson argues that a specific instruction on the dissociative disorder defense was necessary, his defense was only an attempt to negate the *mens rea* requirement of intent. The district court did specifically charge on the knowing and willful mental state needed for conviction. There was no express statement that the defense of Johnson's dissociative state negated *mens rea*, but the instructions clearly indicated to the jury that a willful mental state was needed. While Johnson obviously would have preferred a more forcefully worded statement about his defense, the district court did not err in instructing the jury.

## IV.  *The Sentence Enhancement*

■ The district court enhanced Johnson's offense level by two points after finding by a preponderance of the evidence that Johnson had given deliberately false testimony. U.S.S.G. § 3C1.1. Johnson argues that this enhancement penalizes him for exercising his constitutional right to testify on his own behalf. As the Supreme Court recently stated, however, the accused's "right to testify does not include a right to commit perjury." *United States v. Dunnigan*, —— U.S. ——, ——, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993). The § 3C1.1 enhancement does not violate a defendant's constitutional rights if the defendant has made sworn statements that he knows to be false. *See id.* at ——, 113 S.Ct. at 1117; *United States v. Bonds*, 933 F.2d 152, 155 n. 2 (2d Cir.1991); *United States v. Matos*, 907 F.2d 274, 276 (2d Cir. 1990). Here, the district court found by a preponderance of the evidence that Johnson had committed perjury by lying about his experiences in Vietnam. We review such a factual finding for clear error; no such error is present here. Consequently, in light of *Dunnigan*, the district court did not err in enhancing Johnson's sentence under U.S.S.G. § 3C1.1 for obstruction of justice.

## CONCLUSION

For these reasons, we affirm the judgment of the district court.