## CIRCUIT COURT OF ACCOMACK COUNTY

Frederick A. Pusey

    v.

H & H Consolidated, Inc., et al.

September 25, 1997

Case No. (Law) 95CL010

BY JUDGE GLEN A. TYLER

In this action at law for wrongful discharge of an employee, the Court must decide on motion for summary judgment whether it has jurisdiction to hear the matter. Specifically, the question is whether certain real property of the United States held by the National Aeronautics and Space Administration (NASA) located at its flight facility on the mainland at Wallops Island, Virginia, is a Federal enclave where there would be exclusive Federal jurisdiction or whether there is concurrent Federal and State jurisdiction at the facility, such that Virginia's Right-to-Work laws would apply.

The plaintiff, Frederick A. Pusey, was employed by one of the defendants, H & H Consolidated, Inc., a private contractor with NASA at its Wallops Island, Virginia, flight facility. The defendant, Local Lodge 2552, and the defendant, District Lodge 74, both of the International Association of Machinists and Aerospace Workers, are the collective bargaining agents for employees of H & H at the flight facility. Pusey was never a member of the union, though as an employee he was among those represented by the union. By the terms of a collective bargaining agreement between the union and H & H, all employees of H & H were required to be members of the union and pay dues, or if not members, pay an amount equivalent to dues.

The Right-to-Work laws of Virginia, pursuant to Va. Code Ann. § 40.1-58.1, et seq. (1994 Repl. Vol.), provide generally that persons within the jurisdiction of the Commonwealth are not required as a condition of employment to either join a union or pay an amount equivalent to union dues. They may seek damages for an abridgement of the right to work.

Nevertheless, for his failure to join the union representing H & H or pay an amount equivalent to dues, Pusey was discharged. Defendants' initial defense is that the Right-to-Work laws of Virginia do not apply because the NASA facility is governed under exclusive Federal jurisdiction.

This lawsuit was commenced by a typical motion for judgment. Initially, defendants sought to remove the case to the United States District Court, which plaintiff resisted. Applying the law of removal of state-initiated actions to Federal courts, the District court remanded the case to this Court. The District Court did not decide the issue of jurisdiction for purposes of this case. The District Court stated "[i]t remains unclear whether the United States acted in accordance with the statutory authority to assume exclusive jurisdiction over the [NASA] facility ... [and] there exists an additional question as to whether exclusive jurisdiction over Wallops Island [sic] reverted to Virginia ... ." *Pusey v. H & H Consolidated, Inc.*, No. 2:95cv134 (E.D. Va., April 25, 1995).

The defendants filed their answers and affirmative defenses, among which is the defense that this cause of action arose at Wallops Island, Virginia, at the NASA flight facility, a Federal enclave of exclusive jurisdiction, excluding the jurisdiction of this Court and thus the effect of the Right-to-Work laws of the Commonwealth of Virginia.

Plaintiff has filed his motion (revised) for partial summary judgment, requesting the Court to decide the issue of jurisdiction. All parties, recognizing this as a preliminary issue that would be dispositive of the matter, have agreed upon "Joint Stipulated Exhibits" filed with the Court as a basis for the Court's findings of facts and conclusions of law. Defendants also move for summary judgment in their favor on the issue of jurisdiction.

Apparently, all parties agree that, if there is concurrent Federal and State jurisdiction, the Right-to-Work laws of Virginia may apply and, if there is exclusive Federal jurisdiction, they do not apply.

The facts in this case on the issue of jurisdiction are quite interesting, but the evidence upon which they are based is not uncomplicated. The Court has reviewed the agreed joint stipulated exhibits and finds the facts that follow in this opinion.

The Federal Government can acquire exclusive jurisdiction over its proprietary property if the Federal and State Governments agree. *Paul v. United States*, 371 U.S. 245, 9 L. Ed. 2d 292 (1963). The General Assembly of Virginia, 1940 Va. Acts, Chapter 14, ceded to the United States exclusive jurisdiction over such lands as were to be acquired for use as auxiliary airfields in connection with the development of the Hampton Roads Naval Air Station, provided that exclusive jurisdiction would continue "no longer than"

such lands "shall be used and occupied by the United States for naval purposes." The head of any agency of the United States Government need not but may accept a cession of exclusive jurisdiction over property it acquires by filing a notice with the proper State authorities, without which no such exclusive jurisdiction has been accepted. 40 U.S.C. § 255. That portion of the Act of Congress pertinent to this case was adopted in 1940.

What is now the mainland portion of the NASA facility, which is the subject of this lawsuit, was acquired by the United States Navy in four separate parcels of land. Incidentally, not among the four parcels is an actual island, an Eastern Shore of Virginia barrier island, also named Wallops Island, located east of the NASA mainland facility. Confusingly, the NASA mainland facility has the address, Wallops Island, Virginia. Rocket launching pads and the U. S. Navy AEGIS Combat Training System are presently located on the offshore island, which is connected to the Eastern Shore well south of the NASA mainland facility by a causeway and bridge.

The first of the four mainland parcels, containing 550.70 acres, was acquired in 1942 by condemnation "for the purpose of establishing an outlying landing field for the Fifth Naval District ... ." Acting Secretary of the Navy, James Forestal, by letter received on May 6, 1943, by then Virginia Governor Colgate W. Darden, accepted exclusive jurisdiction on behalf of the United States.

The second parcel, containing 723 acres adjacent to the first parcel, was acquired by condemnation in 1942 "for the purpose of the use of the United States in connection with the establishment of an Outlying Flying Field ... ." Acceptance of exclusive jurisdiction by Secretary Forestal was again accomplished by letter to Governor Darden received the same date, May 6, 1943.

The third parcel, containing 91.70 acres adjacent to the second parcel, was acquired by condemnation in 1944 "for use in the construction of a Naval Ordnance Aviation Test Station to be used in connection with the Naval Auxiliary Air Station ... ." Acting Secretary of the Navy, Dan A. Kimball, by letter received five years later on September 1, 1949, by then Virginia Governor William M. Tuck, accepted exclusive jurisdiction on behalf of the United States.

The fourth parcel, containing 879.83 acres adjacent to parcels two and three, was acquired by condemnation in 1952, "for the expansion of the United States Naval Auxiliary Air Station and Naval Aviation Ordnance Test Station ... ." There has never been any notice of acceptance of exclusive jurisdiction on behalf of the United States filed with the Governor or in any other manner prescribed by the laws of the Commonwealth.

The question thus is narrowed further to a determination whether the exclusive jurisdiction of the United States in the three parcels reverted to the Commonwealth of Virginia for failure of the Navy to use and occupy the property for naval purposes.

The language in the Virginia Act of the cession of jurisdiction is similar to language, in real property law, of the possibility of reverter and not similar to the language of a right of entry for condition broken. In the former, the reverter in real property law is "automatic."

According to NASA history, the Secretary of the Navy transferred the Naval Air Station to NASA in 1959. At a formal ceremony, the Navy Base Commander deactivated the facility, lowered its American flag, and a flag belonging to NASA was raised. All Navy personnel departed. That the entire four parcels were transferred, including both the Air Station and the Ordnance Test Station, is confirmed by a very significant letter from the Navy to NASA in 1961 describing the total acreage at 2,230 acres (it was most likely 2,245.23 acres) and valuing all property, improvements, utilities, and 296 buildings at over $24,000,000.00.

Twenty-six years later, in 1987, NASA as host and the Navy through its Naval Sea Systems Command as tenant entered an agreement to permit Wallops Island to be used by NAVSEA to develop its AEGIS Combat Systems Center. It is clear from the agreement that it applies to the offshore Wallops Island. It is unclear whether it applies to the mainland NASA facility. The Navy began to use and occupy a substantial portion of the island. From the agreement alone, it would be an assumption at best that the Navy began to use and occupy the mainland NASA facility under examination in this case. Furthermore, there is no evidence that the Navy had used or been in substantial occupation or even partial occupation of the mainland facility for twenty-six years previous to the agreement. The Navy's AEGIS Commander at Wallops indicated by letter of April 8, 1988, that its personnel were residing at the NASA Wallops Flight Facility within a Navy compound. But the letter reflects that there was uncertainty regarding the nature of United States jurisdiction and that the matter needed to be cleared up. In a letter of May 18, 1988, from Navy Legal Counsel to NASA Legal Counsel, it is indicated that the residential compound for AEGIS was located on the acreage at the NASA facility for which no acceptance of jurisdiction document was ever located. And again, uncertainty over jurisdiction continues to be reflected in the letter. By letter of July 26, 1988, from NASA legal counsel to Navy legal counsel, it is confirmed that the fourth parcel is the one upon which AEGIS residential housing is located. In a memorandum of February 16, 1990, to the Virginia Commissioner of Labor and Industry, it is stated that, in

March of 1984, the Navy obtained a use permit from NASA for sixty acres on parcel four. It is interesting to note that in the memorandum attached to that letter, NASA counsel observes that because Navy personnel have arrived and the tract is again being used and occupied by the Navy "then there might be a tenuous argument that exclusive jurisdiction would be regained." Then the observation follows that "without the letter of acceptance or some deed for the fourth parcel, we cannot assume exclusive jurisdiction was initially given."

Then, significantly, in a letter of August 9, 1989, from Frank Moore of NASA to the Virginia Department of Labor and Industry, it is concluded that the mainland NASA facility is not subject to exclusive Federal jurisdiction. Thus, we have the NASA conclusion at that time, whether or not its opinions are significant.

Regarding recent use by the Navy of parcels one, two, and three, an investigation conducted for the Virginia Department of Labor and Industry in 1990 found that the Navy periodically uses the airfield for unscheduled landing of aircraft and for refueling during training from a Maryland Navy base. The airfield is available for emergency landing. However, there are no Navy planes stored at Wallops, nor are there Navy personnel other than AEGIS personnel on parcel four.

Nevertheless, when confronted with the issue of whether to enforce Virginia's Right-to-Work laws at the NASA facility, the Department of Labor and Industry concluded that there continued to be exclusive Federal jurisdiction over the whole NASA facility. The Commissioner, Carol Amato, declined to intervene by letter to NASA in May of 1990. Frank Moore of NASA, in a clear and concise letter of June 25, 1990, to Carol Amato, noted his exception.

By 1994, General Counsel for NASA had apparently concluded that there very well may be exclusive Federal jurisdiction at the NASA flight facility. The Attorney General of Virginia, in a letter of September 16, 1994, to NASA General Counsel states the opinion of the Attorney General that the mainland parcels at the NASA facility are not subject to exclusive Federal jurisdiction.

This Court's conclusion regarding the material facts is that it is clear that there never has been exclusive Federal jurisdiction in the Federal Government on parcel four. And as of 1961, the U. S. Navy transferred parcels one, two, and three, over which the Federal Government had exclusive jurisdiction, to NASA and ceased to use and occupy the three parcels for Naval purposes. That condition continued for many years. Therefore, concurrent jurisdiction reverted to the Commonwealth of Virginia. There is no law that provides that exclusive Federal jurisdiction could spring up again at the much later time

when the Navy again was permitted by NASA to use some of its property for some naval purposes.

The matter of governmental jurisdiction over lands acquired by the United States is statutory. *Waltrip v. Commonwealth*, 189 Va. 365, 53 S.E.2d 14 (1949); *United States v. Johnson*, 994 F.2d 980 (2d Cir. 1993). The basis for determining jurisdiction used by the Virginia Department of Labor and Industry is not appropriate. There is no law indicating that jurisdiction is determined by the way in which a Federal facility is operated or presents itself in terms of jurisdiction, nor by the way in which a facility is perceived and treated by others in that regard. Only cession and acceptance in the formal manner prescribed by the cited statutes will confer exclusive jurisdiction. Furthermore, exclusive jurisdiction may be qualified or conditional. *Pratt v. Kelly*, 585 F.2d 692, 696 (1978); *S.R.A., Inc. v. Minnesota*, 327 U.S. 558, 90 L. Ed. 851 (1945). If the conditions as stated come to pass, as in this case, the exclusive nature of jurisdiction can revert if that is what is provided in the cession of jurisdiction.

On the central factual issue in this case, whether the property ceased to be used and occupied by the Navy, the defendants argue that *Johnson*, 994 F.2d at 986, is controlling in their favor. Defendants' reliance on that case is mistaken. It is clear from that case that the interpretation regarding use and occupation must be broad and inclusive, not strict, allowing for evolution of the Navy's needs. But in the case at bar, there is not a question of the function of the ceded property evolving over time, but whether it ceased altogether. In the *Johnson* case, the Navy continued to occupy the property, though it had ceased to use the property for shipbuilding and traditional Navy yard purposes as originally envisioned. Here, the entire property, all three parcels that were ceded exclusively to the Navy, ceased to be either used or occupied by the Navy for many years. The property was transferred to NASA. The Navy left completely and at that time permanently causing jurisdiction to revert to the Commonwealth. It is not credible to argue the "evolution" concept of the *Johnson* case on the facts here. And there is no re-creation concept known to the law of jurisdiction, which is given or taken by executive action based on legislative authority. Certainly as title by adverse possession of land does not apply against governments, neither does adverse jurisdiction.