776 A.2d 884

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT/CROSS–APPELLANT, v. WILLIAM J. VOGT, DEFENDANT–APPELLANT/CROSS–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 14, 2001—Decided June 25, 2001.

370

Before Judges NEWMAN, BRAITHWAITE and WELLS.

*Frank L. Corrado* argued the cause for appellant/cross-respondent, (*Rossi, Barry, Corrado, Grassi & Radell,* attorneys; *Mr. Corrado,* on the brief).

*Steven D. Scherzer* argued the cause for respondent/cross-appellant, (*Cooper Perskie April Niedelman Wagenheim & Levenson,* attorneys; *Michael Gross,* on the brief).

The opinion of the court was delivered by

BRAITHWAITE, J.A.D.

Following a trial *de novo* in the Law Division, defendant appeals from his conviction for using property "under the control" of the Division of Fish, Game and Wildlife (the "Division") contrary to regulations established by the Division, *N.J.S.A.* 23:7–9(d) and *N.J.A.C.* 7:25–2.5(a)2. Defendant was acquitted of violating the Lower Township anti-nudity ordinance, Section 3–2.6. The State cross-appeals from defendant's acquittal.

On appeal defendant contends:

*POINT I*

THE STATE DID NOT ESTABLISH JURISDICTION TO ENFORCE ITS LAW ON THE FEDERALLY OWNED PORTION OF HIGBEE BEACH.

*POINT II*

WHATEVER THE STATE'S ABILITY TO REGULATE THE UPLAND PORTION OF HIGBEE BEACH, IT COULD NOT ENFORCE ITS REGULATIONS ON FEDERALLY OWNED RIPARIAN LAND.

*POINT III*

CLOSURE OF THE RIPARIAN AREA, ALLEGEDLY FOR WILDLIFE PRESERVATION, WAS BOTH PROCEDURALLY DEFECTIVE AND WITHOUT FACTUAL BASIS, AND THEREFORE INVALID.

On its cross-appeal, the State argues:

*POINT I*

THE LAW DIVISION ERRED IN REVERSING MR. VOGT'S CONVICTION ON STATE SOVEREIGNTY GROUNDS BECAUSE THE DOCTRINE DOES NOT APPLY WHEN THE FEDERAL GOVERNMENT OWNS THE LAND IN

We reject the contentions raised in the appeal and now affirm.
We dismiss the State's cross-appeal on double jeopardy grounds.

I

The incident leading to defendant's charges occurred on Higbee
Beach in Lower Township ("Township"). The beach area lies
south of and adjacent to the Cape May canal in the Township.
The beachfront consists of both riparian land and upland. Inland
from the beachfront is the Higbee Wildlife Management Area, a
wildlife preserve.

A portion of the area is owned by the federal government. In
1979, the federal government, through the Department of the
Army, granted a twenty-five-year license to the Division "to use
and occupy 196 acres of land and water areas, more or less ... for
the purpose of conserving, maintaining and managing wildlife
resources." The license was subject, however to the Division's
insuring the public's access to the water areas for recreational
purposes, but "no use of any area shall be permitted which is
inconsistent with the State laws for the protection of fish and
game."

Pursuant to the license, the Division adopted regulations gov-
erning this area (as well as other designated State Wildlife
Management Areas). *N.J.A.C.* 7:25–2.1 to –2.26. The regulations
allow the closure of an area upon proper notice, *N.J.A.C.* 7:25–
2.26, and they forbid any person from entering a restricted area.
*N.J.A.C.* 7:25–2.5(a)(2). Defendant was convicted of violating
*N.J.A.C.* 7:25–2.5(a)(2).

In early 1999, the Division began implementing a long-term
management plan for Higbee Beach. Part of that plan was an
attempt to induce certain birds, piping plovers and least terns, to
return to the area. The birds had left the area after 1986 because
of erosion and "environmental intrusion." Accordingly, on July 3,
1999, the Division closed a portion of the licensed area to the

public. The Division posted signs stating that the roped off area was restricted.

At defendant's municipal court trial, the parties stipulated that, on July 4, 1999, defendant had received a written warning from the police chief about breaching the Township's anti-nudity ordinance.

On July 17, 1999, Sergeant Louis Russo of the Lower Township Police Department was patrolling Higbee Beach when he saw defendant, naked, being interviewed by a television reporter. When Russo informed defendant that he was going to have to issue him a ticket, defendant asked "did we see that he was nude." Russo said yes, and defendant then put on his swim trunks. Russo issued defendant a ticket charging him with a violation of the Township anti-nudity ordinance. At the entrance to the beach, there was a sign citing the ordinance and warning against public nudity. It is undisputed that defendant was on the federally owned part of the beach when he was seen nude.

Officer Ely of the Division was with Russo when he cited defendant. Defendant told Ely that he was going to walk into the restricted area. Ely told him not to, but defendant "lifted the string and went into the restricted area." Defendant had told Ely earlier that he was going to do that, so it was not a surprise to Ely. Defendant told Ely that the Division had no "authority to restrict access to federal property."

Defendant appeared pro se but chose not to testify. His lone witness was Arlene, his wife, who testified that she and defendant had been given a written warning on July 3, 1999, about being on the restricted area of the beach and on July 4, 1999, about being nude. She confirmed that on July 17, 1999, defendant was nude on the beach and also that he entered the restricted area.

II

Defendant contests New Jersey's jurisdiction to enforce its wildlife-preserve law and regulations on land that is owned by the

federal government. He reasons that the Law Division erred with respect to a key fact finding, namely, that the land was acquired by the federal government after 1940, the critical date under the pertinent federal law for determining whether a state has jurisdiction over this kind of dispute. Absent clear proof of a post–1940 acquisition, concludes defendant, the settled law is that only the federal courts have jurisdiction.

The State counters that the record amply supports the Law Division's finding that the federal government acquired the pertinent portion of Higbee Beach in 1943, thereby triggering the application of the federal statute enacted in 1940. The State argues that jurisdiction presumptively lies with the State, except when, unlike here, the federal government expressly has accepted the State's cession of jurisdiction.

The United States Constitution gives to the federal government the power to acquire property within a state. *U.S. Const.* art. I, § 8, cl. 17. While this clause grants the federal government a proprietary interest in the property, it does not in itself confer federal jurisdiction over that property, which instead depends upon whether the state has ceded jurisdiction and the federal government has accepted it. *Paul v. United States,* 371 *U.S.* 245, 264, 83 *S.Ct.* 426, 437, 9 *L.Ed.*2d 292, 303 (1963); *United States v. Johnson,* 994 *F.*2d 980, 984 (2d Cir.), *cert. denied,* 510 *U.S.* 959, 114 *S.Ct.* 418, 126 *L.Ed.*2d 364 (1993).

Before 1940, there was no federal statute setting forth the requirement to obtain federal jurisdiction over land acquired from the states. To fill that gap, in February 1940, Congress enacted an amendment to 40 *U.S.C.A.* § 255 that conditioned such jurisdiction on formal acceptance by the United States. The amendment relevantly reads:

> Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate

jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction . . . on behalf of the United States *by filing a notice of such acceptance with the Governor of such State or in such manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted.*

[40 *U.S.C.A.* § 255 (emphasis added).]

■ The purpose of the amendment was to ensure that the states' "automatic cession statutes did not saddle the United States with unwanted jurisdiction"; hence " § 255 requires the government to take some sort of affirmative action to demonstrate acceptance of the jurisdiction." *Johnson, supra,* 994 *F.*2d at 985.

■ The amendment applies only to land acquired after its effective date, February 1, 1940. *Markham v. United States,* 215 *F.*2d 56, 58 (4th Cir.1954), *cert. denied,* 348 *U.S.* 939, 75 *S.Ct.* 360, 99 *L.Ed.* 735 (1955). As to land acquired before then, courts will presume federal jurisdiction. *Ibid.; State v. Ingram,* 226 *N.J.Super.* 680, 690, 545 *A.*2d 268 (Law Div.1988). The effect of the amendment was to reverse that presumption as to post-amendment acquisitions: courts now will presume that there is no federal jurisdiction, subject to rebuttal by proof that the federal government formally accepted jurisdiction in the way specified by that law. *United States v. Johnson,* 426 *F.*2d 1112, 1114–15 (7th Cir.), *cert. denied,* 400 *U.S.* 842, 91 *S.Ct.* 86, 27 *L.Ed.*2d 78 (1970); *State v. Ingram, supra,* 226 *N.J.Super.* at 690–91, 545 *A.*2d 268.

That law allows two alternative ways for the United States to "indicate acceptance" of federal jurisdiction: (1) a formal filing with the state's governor, or (2) "in such other manner as may be prescribed by the laws of the State where such lands are situated." 40 *U.S.C.A.* § 255. Defendant concedes that no formal filing with the governor occurred here. He insists, however, that the second basis for acceptance is present.

■ The parties do not dispute the foregoing law. The only dispute is whether this property was acquired by the United States after February 1, 1940, in which case defendant cannot claim the benefit of the presumption of federal jurisdiction.

The Law Division judge found that title to the land in question passed to the federal government in 1943. He relied on three items of evidence: (1) the 1972 Department of Environmental Protection ("DEP") map's reference to the 1943 taking by condemnation; (2) defendant's testimony at the 1999 Tidelands Resource Council meeting, representing the date of conveyance as 1945; and (3) the July 1999 letter from the Army to the Township disclaiming federal jurisdiction.

On appeal, defendant balks at the persuasiveness of the first two items of evidence. He apparently ignores and does not address the letter from the Army disclaiming federal jurisdiction. His reasoning comprises a single sentence: "Neither of these internally inconsistent pieces of 'evidence' ... establishes the date of federal acquisition beyond a reasonable doubt." Apparently, defendant's reference to internal inconsistency is to his testimony that the conveyance was in 1945 as contrasted to the 1943 date set forth on the DEP map. In his reply brief he adds that the references on the DEP map, as well as on the related 1972 grant of riparian rights, were "entirely collateral to the purpose of the documents that contain them, [and] are hardly sufficient to establish, beyond a reasonable doubt, when the United States acquired the property."

The State responds that the DEP map and the 1972 conveyance render it beyond question that this land was transferred to the United States in 1943. We agree that these two items, both of which were introduced into evidence by defendant himself, provided sufficient support for the judge's finding of the date of federal acquisition, beyond a reasonable doubt. While it is true that a copy of the actual 1943 deed was not in evidence, the 1972 conveyance and map did refer to the exact book and page number where that deed appears. If defendant disputed the 1943 date, he could have proffered evidence to refute it, but he did not. Indeed, he himself believed that the transfer was after 1940, as evidenced by his representation to the Tidelands Resource Council that the acquisition was in 1945. Further, the letter from the Army

provides further support for the finding, beyond a reasonable doubt, that the federal government acquired this land after 1940.

■ Defendant seeks relief in an alternative argument: even if the post–1940 law applies, the United States did indicate its acceptance of jurisdiction by the second means contemplated by 40 *U.S.C.A.* § 255, namely, by showing its acceptance "in such other manner" prescribed by state law. Defendant construes this alternative language to mean that acceptance may be evidenced by any sort of affirmative act, and he argues that the 1979 license granted to the Division qualifies as such an affirmative act.

■ Defendant's premise is not supported by the plain language of the act. Read in context, 40 *U.S.C.A.* § 255 means that acceptance may be effected by a formal filing with the governor or by whatever means of acceptance is stipulated by a state statute, if any. The sense of the latter language is that, if a state has adopted a law specifying how the United States should manifest its acceptance, that procedure must be followed. *See DeKalb County, Ga. v. Henry C. Beck Co.*, 382 *F*.2d 992 (5th Cir.1967):

The language "or in such other manner as may be prescribed by the laws of the State" does not relate to the decision of the United States whether it shall or shall not acquire jurisdiction, but to the mode by which acceptance is indicated once the appropriate officer has deemed it desirable to acquire jurisdiction.

[*Id.* at 995.]

There is no law in New Jersey setting forth a procedure for acceptance of federal jurisdiction in this context. The cession statute, *N.J.S.A.* 52:30–2, does no more than cede jurisdiction to the United States for lands it acquires in New Jersey, but neither it nor any other law prescribes an acceptance procedure. As we noted above, the purpose of 40 *U.S.C.A.* § 255 was to avoid the federal government having to assume unwanted jurisdiction granted by states' cession acts. The federal statute added the new requirement that the United States affirmatively accept what the state law was ceding to it. Absent formal acceptance by either filing with the Governor or following a procedure mandated by statute, *N.J.S.A.* 52:30–2 does not confer federal jurisdiction over

Higbee Beach. *See State v. Ingram, supra,* 226 *N.J.Super.* at 689–90, 545 *A.*2d 268 (holding that because the United States had not accepted jurisdiction pursuant to the means specified in the federal statute, *N.J.S.A.* 52:30–2 did not confer federal jurisdiction over a state indictment charging illegal disposal of hazardous waste on federal land within New Jersey).

This interpretation is supported by the case on which defendant relies, *Johnson, supra,:*

> [Section] 255 sets out *two* distinct ways for the federal government to accept jurisdiction. The first is by formal acceptance, which concededly is not present here. The second is by "such other manner as may be prescribed by the laws of the State where such lands are situated." 40 *U.S.C.* § 255. This authorizes the United States to accept jurisdiction by complying with state law requirements governing [cession]. The act of compliance with those requirements is tantamount to formal acceptance.
>
> [994 *F.*2d at 985.]

In *Johnson,* there was a state law prescribing how the federal government must implement its acceptance of jurisdiction ceded by the state. Absent a similar law in New Jersey, the conceded lack of a formal filing with the Governor defeats defendant's attempt to shift jurisdiction to the federal government.

In sum, the Law Division judge correctly held that New Jersey properly exercised jurisdiction over the restricted-area offense.

### III

█ Defendant argues what appears to be an alternative theory to the one he advances in Issue One: even if New Jersey did have jurisdiction over the "upland" portion of Higbee Beach, it had no such authority over the riparian portion, which was not included in the 1979 license from the United States to New Jersey. Because defendant entered the restricted area from a point on the riparian portion, he was never on the upland portion of the restricted area. Therefore, he argues that the State had no power to prosecute him.

The municipal court judge rejected this theory, summarily commenting that the State does "have the lease there, even

though it's owned by the federal government." The Law Division judge agreed, based on his reading of the 1979 license. He noted that the license, while expressly requiring the State to keep the "water areas" open to public use and recreation, expressly guaranteed the State's right to restrict the area when required by "the state laws for the protection of fish and game." He also held that the license did include both the upland and riparian areas:

The license itself provides that it covers "196.0 acres of land *and water areas,* more or less ... as shown in red upon the map ... which is attached hereto." The map shows an area marked in bold lines which is presumably the area the license covers. Captain Markowski marked a blue X on this map where the defendant was given his summons. [T]he map is unclear as to whether the riparian lands are within the border. However, the license does clearly reference water and beach areas, and the only possible water or beach areas within the map are the riparian lands at issue in this case. The riparian lands were acquired by the federal government in 1972, seven years before the license was granted to the Division. The federal government had title to the riparian lands when the license was issued, and referenced these lands on the license. Thus, the license does in fact encompass the riparian lands.

Defendant's key factual premise is that "his entry into closed property occurred on the sliver of riparian land" and thus he did not have to cross the dry land portion of the restricted area before entering the water. In support he cites his attorney's oral argument in the Law Division, and he claims that "[t]he testimony and exhibits presented at trial confirm this fact."

We reject defendant's contention here. Our standard of review is whether the finding by the trial judge is supported by sufficient credible evidence present in the record as a whole. *State v. Locurto,* 157 *N.J.* 463, 470–71, 724 *A.*2d 234 (1999); *State v. Johnson,* 42 *N.J.* 146, 161–62, 199 *A.*2d 809 (1964). Where there is substantial evidence to support the findings, an appellate court is bound by that determination. Applying that standard here, we are satisfied that the Law Division judge properly determined that the regulations applied to defendant's conduct on July 17, 1999.

IV

Defendant argues that his conviction must be vacated because the DEP's decision to close the area in question "was both

procedurally and substantively defective." He advances three reasons: (1) contrary to the trial judge's ruling, defendant need not have filed a separate administrative appeal in order to challenge the closing; (2) the closing was factually unsupportable; and (3) DEP failed to engage in the required hearing and fact-finding process.

The State counters that the closing was authorized by the 1979 license from the Army and was properly implemented pursuant to the Division's pertinent regulations.

■ We agree that defendant did not have to file a separate administrative appeal to challenge the Division's decision to close a portion of Higbee Beach. A defendant in a criminal or quasi-criminal matter may defend the charge by challenging the validity of the regulation upon which the charge is based. *State v. Barcheski*, 181 *N.J.Super.* 34, 38, 436 *A.*2d 550 (App.Div.1981).

■ Defendant contends that the State failed to prove a need for the restriction. In particular, reasons defendant, there was no expert evidence that the intended beneficiaries of the restriction, the least terns and piping plovers, frequented that area. He highlights his own statement during summation in municipal court that, because the area was tideland that was under water twice a day, "any bird that could nest on that beach has got to be wearing snorkel gear." And he argues in his brief on appeal, that in view of the police's frequent use of "ATV's" in that area, there hardly could be "a *bona fide* need, for conservation purposes, to restrict human entry into the area." Finally, defendant contends that the closure was a pretext whose purpose was "not to protect wildlife but to assist Lower Township in its crusade to eliminate nudity on Higbee Beach."

The State responds that the testimony of Captain Markowski of the Division provided ample factual basis for the closure. Markowski said that the closure was part of a long-term plan initiated in early 1999, and was designed to encourage the two kinds of

birds to return to the area. He explained the need for the restriction:

> The area was restricted for several reasons. First of all, there's been a cut in that area where it's allowed to cut back and get into a sod bank-type of environment. That sod bank environment makes it very good for birds to feed in that area. And if you notice the pictures of the beach, even the one that I saw, you notice a brown area that is just south of the jetty. The rest of the beach is very white. Because of the construction of the break water or jetty, it has caused currents to form, cutting back. Thereby, eliminating some of the white beach that has been there and exposing some of the darker beach, which is an ideal area for the birds to feed. Also, once nesting and recruitment [sic] and the birds become fledged, the young birds then seek out areas where they can feed and feel safe. And if the areas are of good enough quality, they have a good shot of coming back there subsequent years and nesting. At about the time that we closed this on July 3rd, we were getting out first fledglings from our piping plover colonies in Ocean City and Brigantine.

The Law Division judge ruled that the closure was supported by the regulations and the license. First, he noted that the closure was authorized by *N.J.A.C.* 7:25-2.26(a), which allows the Division to exclude the public from "any specific land and water areas under its control, effective immediately upon making the finding that prevailing conditions warrant such restriction to protect the users, or to protect and preserve the land and water areas, or both, and continuing for so long as such conditions warrant."

Second, the judge found that paragraphs 6 and 7 of the 1979 license also were sources of authority. Paragraph 6 allows the State to close the licensed area to protect wildlife and to enforce Fish and Game regulations. Paragraph 7 requires that the State allow public access to water areas, except when "inconsistent with the state laws for the protection of fish and game."

Third, the judge found that the closure was not arbitrary, capricious or unreasonable, and that it was supported by the evidence. He reasoned as follows:

> In the present case, the Division had a reason for the closure of the lands. Specifically, the Division was restricting the lands in order to protect the least terns and piping plovers that nest and feed in the area. Although the defendant[ ] disagree[s] with the Division's conclusions regarding these birds, it was within the Division's authority pursuant to *N.J.A.C.* 7:25-2.26 to close the area. As Judge Tourison [J.M.C.] stated, "[I]f you don't like an action by the DEP on that, the remedy is to file an action to take it up to an Administrative Law Judge." The

defendant clearly violated the state regulations by entering a restricted area. As such, the defendant was clearly guilty of the State violation. The defense argues that the Division of Fish, Game & Wildlife restricted the area in question as a pretext to prevent nude sunbathing. Not only is there no evidence of that but the argument suggests complicity between local and state officials that is also highly unlikely.

Given Markowski's testimony about the purpose of the closure, we agree with the Law Division judge that there was sufficient support for the closure. Defendant's own self-serving denial of any need for the reduction was not enough to negate the State's evidence. Further, his accusation that the Division colluded with the Township by imposing the restriction solely as a pretext to enable the Township to enforce its anti-nudity ordinance was not supported by any evidence.

Defendant complains that "the decision to restrict the area was made on an *ad hoc*, discretionary basis, by Markowski and unnamed superiors, without a hearing, without a record, and without any formal substantiation of the need for closure." He insists that *N.J.A.C.* 7:25–2.26 demands a more formal process, namely, that the closure must be based on a "finding that prevailing conditions warrant such restriction," *N.J.A.C.* 7:25–2.26(a), and that notice of the closure be: (1) published in the *New Jersey Register* or in a local newspaper, or (2) be the subject of a press release to the news media. *N.J.A.C.* 7:25–2.26(b).

Defendant also claims that notice should have been provided to the federal government, by virtue of 16 *U.S.C.A.* § 460(d), the section under which the 1979 license was issued. That statute authorizes the Army to license lands to the states, with the requirement that the water areas be opened for public use "when such use is determined by the Secretary of the Army not to be contrary to the public interest." 16 *U.S.C.A.* § 460(d). Defendant reasons that: "[t]his language clearly contemplates some federal involvement in any determination to restrict a portion of the property."

The Law Division judge summarily disagreed with defendant's insistence that a formal fact-finding process was needed. He

concluded that the closure was properly implemented under the only procedures that had to be followed, those in *N.J.A.C.* 7:25–2.26(a) and (b). We agree.

Defendant has not shown any authority for a more extensive process than that required by *N.J.A.C.* 7:25–2.26(a) and (b). Markowski explained how the closure decision was reached. He initiated the closure by suggesting it to his supervisors, including the chief of the Division's Bureau of Land Management, and they concluded that the closure was appropriate. A notice was published in the press, followed by a two-week "period of warning." Thus, the Division did comply with the only governing regulation, in that it made a "finding" that closure was warranted, and it provided the requisite notice.

Further, nothing in 16 *U.S.C.A.* § 460(d) demands any sort of notice to the Army. Should the Division violate the 1979 license, the Army is free to seek a judicial remedy at that time. In sum, defendant's conviction was not negated by any deficiencies in the closure decision.

### V

The State's point on the cross-appeal is that the Law Division wrongly acquitted defendant on the nudity charge. Defendant has not raised an issue on the State's right to appeal from his acquittal based on double jeopardy grounds. We conclude that the State is precluded from appealing defendant's acquittal on double jeopardy grounds and therefore dismiss the cross-appeal.

"It is axiomatic that an acquittal of criminal and quasi-criminal charges insulates the defendant from any further exposure to the criminal process based on the same conduct. That is the mandate of the Fifth amendment." *State v. Gerstmann,* 198 *N.J.Super.* 175, 179, 486 *A.*2d 912 (App.Div.1985). Here, defendant's successful defense rested on evidence that he was on federally owned property when he violated the Township's anti-nudity ordinance. *Id.* at 181, 486 *A.*2d 912. *See also State v.*

*Collette,* 257 *N.J.Super.* 557, 562–64, 608 *A.*2d 990 (App.Div.1992), *certif. denied,* 133 *N.J.* 430, 627 *A.*2d 1136 (1993); *State v. McKelvey,* 142 *N.J.Super.* 259, 261, 361 *A.*2d 96 (App.Div.1976).

Although we are satisfied that the State had no right to appeal and therefore dismiss its cross-appeal, had such a right existed in the State here, we would affirm defendant's acquittal substantially for the reasons expressed by Judge Garafolo in his written opinion of March 30, 2000.

## VI

We affirm the appeal and dismiss the cross-appeal.